IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEWIS BENTLEY | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL W. HARLOW, et al. | : | NO. 11-2423 |

MEMORANDUM

Dalzell, J.                                                                                   March 15, 2016

**I.      Introduction**

We consider here Petitioner's objections to the Report and Recommendation ("R & R")

issued by Magistrate Judge Lynne A. Sitarski.

Lewis Bentley filed this counseled petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254 against Michael Harlow, Superintendent of the State Correctional Institution in

Albion, the District Attorney of the County of Philadelphia, and the Attorney General of the

State of Pennsylvania.  Bentley objects to the R & R, alleging that Judge Sitarski erred when

analyzing his ineffective assistance of counsel and sufficiency of the evidence claims.

For the reasons set forth below, we will overrule Bentley's objections to the R & R,

approve and adopt Judge Sitarski's R & R, dismiss Bentley's habeas petition with prejudice, and

decline to issue a certificate of appealability.

**II.      Standard of Review**

Gibson objects to the R & R pursuant to Local R. Civ. P. 72.1 IV(b), which provides that

"[a]ny party may object to a magistrate judge's proposed findings, recommendations or report

under 28 U.S.C. 636(b)(1)(B) … within fourteen (14) days after being served with a copy

thereof" by filing "written objections which shall specifically identify the portions of the

proposed findings, recommendations or report to which objection is made and the basis for such

objections."  We make de novo determinations on those portions of the R & R and specific

proposed findings or recommendations to which the petitioner objects.  See 28 U.S.C. § 636.


**III.**    **Factual and Procedural History**

We recite the facts and procedural history as evidenced by the record and the R & R.[1]

The Superior Court stated the facts as follows:

> On March 4, 2005 at approximately 1:30 [p.m.], Philadelphia
> Police Officer Estella Tucker went to 6700 Linmore Avenue in the
> City and County of Philadelphia, in response to a radio call of a
> shooting. When she arrived, she . . . met a female later identified as
> Aisha Patton. Officer Tucker observed an abrasion on Patton's left
> leg. When Patton rolled up her pant leg, a projectile fell to the
> ground. Office Tucker recovered the projectile from the ground
> and placed it on property receipt #2575183. . . .
>
> On July 10, 2005, Philadelphia Police Officer Walter Burks
> responded to a radio call of a male shot on the street. In the 6600
> block of Woodland Avenue, Officer Burks came into contact with
> Anthony Fitzsimmons. Fitzsimmons was bleeding from apparent
> gunshot wounds to his right arm and right leg. Officer Burks
> located the actual scene of the shooting as 66th and Greenway,
> about one block away, based on shell casings. . . .
>
> Detective Brian Kelly of Southwest Detectives participated in the
> investigation into the shooting of Anthony Fitzsimmons. Detective
> Kelly went to 66th and Greenway and collected three .32 automatic
> fired cartridge casings (FCC's), two from the street and one from
> the sidewalk. The FCC's were placed on property receipt
> #2607455 and submitted to the Firearms Identification Unit. . . .
>
> Anthony Fitzsimmons testified that on July 10, 2005, he was in the
> area of Upland and Greenway Street. He ran into [Petitioner] that
> morning and asked if he could use [Petitioner's] cell phone to call
> a family member. [Petitioner] agreed and Fitzsimmons used the

---

[1] We may properly reference the R & R's factual and procedural history because Bentley
did not object to this portion of the R & R.  Moreover, our thorough review of the record
confirms that the R & R's recitation of the factual and procedural history in this case is accurate.

phone for about five minutes, then returned the phone to [Petitioner]. At the time, [Petitioner] was asleep in his car. Some time later that day, Fitzsimmons was on 65th and Regent Street where he was staying with a female friend when a male banged on the door and told Fitzsimmons that [Petitioner] wanted to see him on Upland Street. . . . When he arrived, [Petitioner] was not there. [Petitioner's] brother told Fitzsimmons to wait for [Petitioner] to return . . . . [Petitioner's] brother and three other males were present at the time. . . . While Fitzsimmons was waiting, he and [Petitioner's] brother began arguing about [Petitioner's] cell phone. . . . Fitzsimmons claimed that he did not feel threatened by [Petitioner], even though he had seen [Petitioner] with a gun the day before, because [Petitioner] was wheelchair bound. He was more worried about being attacked by the other males. Fitzsimmons decided to walk out into the street where it was more open in the event that he needed help.  He walked up towards Greenway Avenue and the males followed, threatening him. . . . By the time he reached the corner of 66th and Greenway, the argument between Fitzsimmons and [Petitioner's] brother had intensified. The three males were standing on the corner and [Petitioner] was a short distance away from them in his wheelchair, against the wall, next to a payphone. Fitzsimmons heard [Petitioner] say "[f---] that," then heard a pop and saw flashes coming from where [Petitioner] was sitting in his wheelchair. The males then fled. Fitzsimmons . . . felt a sharp pain in his leg. He realized he was shot and bleeding from his arm. . . Fitzsimmons suffered three gunshot wounds [to his right hip, right femur, and right elbow]. . . .

On July 21, 2005, at approximately 4:51 [a.m.], Police Officer Myra Vinson received a radio call to go to the 5300/5400 block of Thomas Avenue. . . . Upon her arrival, she observed a 2001 gray Hyundai two door with the driver side window shot out in front of 5416 Thomas Avenue. . . . Officer Vinson exited her patrol car, went around to the passenger's side and observed . . .Vernon Purnell, hanging out of the passenger side door, bleeding profusely. . . . Officer Vinson called paramedics, prepared a crime scene log and secured the crime scene. Outside the Hyundai, Officer Vinson observed four projectiles and twelve FCC's. Purnell was transported to the Hospital . . . where he died. Bennett Preston M.D., Assistant Medical Examiner . . . testified that Purnell's cause of death was multiple gunshot wounds to the chest, abdomen and extremities. . . ., a total of ten gun shot wounds. The two projectiles and the fragment that were recovered from Vernon Purnell's body were submitted to the [Firearms] Identification Unit for analysis.

3

Police Officer Lamont Fox and Brian Stark of the Crime Scene Investigation Unit processed the crime scene. . . . Police Office[r] Brian Stark photographed the scene and collected sixteen pieces of ballistic evidence: two .32 caliber FCC's; ten .40 caliber FCC's; three bullet specimens; and one fragment. Officer Stark placed the ballistic evidence on property receipt #9004283. The evidence was submitted to the Firearms Identification Unit.

Kenneth Lay of the Philadelphia Police Forensic Science Bureau analyzed all of the ballistic evidence. Mr. Lay testified that the bullet recovered on March 5, 2005 from Aisha Patton . . . was a .40 caliber automatic. The three .32 caliber automatic FCC's collected from [the Fitzsimmons shooting] were fired from the same firearm as the two .32 caliber automatic FCC's collected from [the Purnell shooting]. He also determined that the ten .40 caliber automatic FCC's [from the Purnell shooting] were fired from the same gun. Mr. Lay compared the evidence [from the Purnell, Fitzsimmons, and Patton shootings]. . . . The comparison yielded the following results: all five .32 caliber FCC's [from the Purnell and Fitzsimmons shootings] were fired [from] the same firearm; the bullet specimens and bullet jacket from [the Purnell shooting] were fired [from] the same firearm as the firearm from [the Patton shooting].

Homicide Detective Stephen Buckley of the Special Investigations Unit was assigned to look into the death of Vernon Purnell in late 2005. On April 12, 2006, he interviewed Aisha Patton. Detective Buckley asked Patton about the incident where she had been shot in her leg. Patton told the detective that, on March 4, 2005, [Petitioner] was her fiancé. [Petitioner] had not come home for a couple days, so Patton called [Petitioner's] ex-girlfriend, April Floyd, and [Petitioner] answered the phone. The following day, [Petitioner] came to Patton's house. Patton was angry and began grabbing and fighting with [Petitioner]. . . . Patton attacked [Petitioner] again and [Petitioner] reached into his waistband and retrieved the black automatic handgun that he carried for protection. [Petitioner] and Patton began fighting over the gun and it went off, striking Patton in her leg. She went to a neighbor's house and the neighbor called police. Patton [stated] . . . that the gun belong[ed] to [Petitioner] and that [Petitioner] got rid of the gun shortly after she was shot. Patton reviewed her statement, signed and dated it.

Detective Buckley obtain[ed] a warrant for [Petitioner's] arrest on May 2, 2006. On May 9, 2006, Detective Buckley interviewed [Petitioner] in the Homicide Unit. . . . [Petitioner] told Detective

Buckley that he did not know Purnell. The first time he saw Purnell was at April Floyd's house the night she called the police on him. Purnell came out of Floyd's house and got into a car. Floyd came out and got into the car and the two left.  According to [Petitioner], until then, he was unaware that Floyd, h[is] former fiancée, was seeing anyone. Additionally, Appellant told Detective Buckley that, on the morning Purnell was killed, he was in Atlantic City, New Jersey, with Aisha Patton. [Petitioner's] statement was read into the record. [Petitioner] stated he called Floyd at 5:45 [a.m.] and Floyd told him that somebody had just been shot and she would call him back after she was interviewed by police. [Petitioner] also told Detective Buckley that[] Aisha Patton was shot essentially by accident. He said that the two were tussling over a gun during an argument and the gun went off, hitting her in the leg.  [Petitioner] read the interview, and signed each page. Detective Buckley read [Petitioner's] statement into the record.

At trial, April Floyd testified that [Petitioner] was her ex-boyfriend. They were together for about 4-5 years and the relationship ended in 2004. They broke up because she suspected that [Petitioner] was seeing Aisha Patton. Patton called Floyd and told Floyd that she and [Petitioner] were seeing each other and she had recently had his baby. Floyd told [Petitioner] not to call her again. About five months before the shooting, Floyd became involved with Vernon Purnell. On one occasion, [on July 6, 2005, Petitioner] attempted to break into her house at 5416 Thomas Avenue through the window while she and Purnell were sleeping inside. Floyd called the police. On July 20, [2005,] Purnell came to her house at about 9:00 or 9:30 [p.m.] During the early morning hours [on July 21, 2005], Purnell arose and prepared to go to work. About ten minutes after he left, Floyd heard gunshots outside. She did not hear screaming or sirens so she went downstairs. She saw Purnell's car, still there and heard him calling her for help. She screamed for someone to call the police. Floyd did not see Purnell alive again. About two weeks later, [Petitioner] called and said that he was sorry about [what] happened to her friend.

The Commonwealth introduced telephone calls between [Petitioner] and Patton in an effort to impeach her testimony that she and [Petitioner] were in Atlantic City [when Purnell was murdered]. Patton identified the voices as hers and [Petitioner's]. Patton then admitted that she was not truthful before because [Petitioner] was the father of her son. She did not know where [Petitioner] was on July 21, 2005.

Commonwealth v. Bentley, No. 831 EDA 2013, slip op. at 1-9.

Bentley was convicted of first degree murder, aggravated assault, and two counts of carrying a firearm without a license after a jury trial in the Court of Common Pleas of Philadelphia County.  R & R at 6.  He was sentenced to life in prison.  Id.  Bentley appealed his conviction, challenging the weight and sufficiency of the evidence supporting his conviction, but the Superior Court affirmed the judgment of sentence and the Pennsylvania Supreme Court denied his petition for allowance of appeal.  Id.  Bentley then filed a counseled petition for relief under Pennsylvania's Post-Conviction Relief Act, 42 Pa.C.S. §§ 9541, et seq. ("PCRA").  He filed an amended petition several months after his original petition, raising his insufficiency of the evidence claim and four ineffective assistance of counsel claims.  Id.  Before the PCRA Court ruled on his petition, Bentley filed a pro se habeas petition in this court which was stayed pending the resolution of the PCRA petition.  Id.

The PCRA Court dismissed Bentley's petition and the Superior Court affirmed that dismissal.  Id.  Bentley did not seek allowance of appeal to the Pennsylvania Supreme Court.  Id.  His counsel informed the Honorable William Yohn, the presiding judge at that time, that Bentley's state proceedings had concluded, and Judge Yohn lifted the stay on this habeas petition.  This case was referred to Magistrate Judge Sitarski for a Report and Recommendation, and subsequently transferred to our docket.  Judge Sitarski issued her R & R on October 20, 2015, see docket entry #27, and Bentley timely filed his objections.  Obj. to R & R, Nov. 3, 2015 (docket entry #29).

IV.   **Discussion**

Bentley objects to the R & R's disposition of his ineffective assistance of counsel and sufficiency of evidence claims.  We will analyze each objection separately and pursuant to the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").

A.     **AEDPA Standard**

AEDPA permits someone in state custody to file a petition in federal court for a writ of habeas corpus, 28 U.S.C. § 2254(a), but mandates great deference to the state court's factual findings and legal determinations. See Woodford v. Viscotti, 537 U.S. 19, 24 (2002) (explaining Section 2254(d)'s highly deferential standard for evaluating state court rulings); see also Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (explaining that AEDPA increased the deference federal courts must give to a state court's factual findings and legal determinations). In fact, AEDPA only permits a federal court to grant habeas relief when it finds that a state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Moreover, we must presume that the state court's findings of fact are correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

A state court's findings are "contrary to" Supreme Court precedent if the state court "arrives at a conclusion opposite to that reached by this Court on a question of law," or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision can be considered an "unreasonable application" of federal law under two circumstances. First, a state court decision is considered unreasonable when such court "identifies the correct governing legal rule…but unreasonably applies it to the facts" of a particular case. Id. at 407. Second, a state court decision can be considered unreasonable when

it extends a legal principle espoused by the U.S. Supreme Court to a new context or, conversely, refuses to extend that principle to a new context where it should indeed apply.  Id.

A state court decision is considered to have come to an unreasonable determination of the facts only when its factual findings are "objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Moreover, "[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Id.  But, "deference does not imply abandonment or abdication of judicial review [or]…by definition preclude relief." Id.

A petitioner must exhaust his state court remedies before obtaining habeas relief.  28 U.S.C. § 2254(b)(1)(A).  In Pennsylvania, a petitioner exhausts his state court remedies by fairly presenting his claims to the state court and then the Pennsylvania Superior Court.  A petitioner need not seek allocatur from the Pennsylvania Supreme Court in order to exhaust his state court remedies.  Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004) (examining the effect of the Pennsylvania Supreme Court's May 9, 2009 Order regarding appeals from criminal convictions and post-conviction relief matters).

If a petitioner fairly presented his claim to the state court, but the state court declined to review the claim on the merits because of a failure to comply with a state procedural rule, then the claim is procedurally defaulted.  Harris v. Reed, 489 U.S. 255, 262-63 (1989).  If a lower state court has declined to review a claim based on a procedural default, and the claim is not later addressed on the merits by a higher state court, then the federal habeas court must presume that the higher state court's decision was founded upon a procedural default identified by the lower state court.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) (explaining also that if a lower state court comes to a reasoned judgment in rejecting a federal claim, and a higher state court upholds

8

that judgment without explanation, then the federal habeas court must assume that the higher state court rested upon the same grounds as the lower state court).  If a petitioner fails to exhaust a claim and it is clear that the state court did not consider that claim because of a state procedural rule, then the claim is procedurally defaulted.  Coleman v. Thompson, 501 U.S. 722, 735 (1991).

We may also not review procedurally defaulted claims unless the petitioner can demonstrate a requisite cause for the default and show that actual prejudice exists as a result of the alleged violation of federal law, or that failure to consider the claims would result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 750.  To demonstrate a requisite cause for default, a petitioner must show that some objective factor external to his defense impeded his efforts to comply with the state's procedural rules.  Id. at 753.  Such cause may include showing that (1) the factual or legal basis for a claim was not reasonably available, (2) some interference by state officials made compliance with the state procedural rules impracticable, or (3) there was ineffective assistance of counsel caused by attorney error.  Id.

### B.      Insufficient Evidence Claims

Bentley objects to the R & R's finding that his insufficient evidence claims relating to his convictions on aggravated assault and first degree murder lacked merit.[2]  The clearly-established federal law governing Bentley's claims that his conviction was based on insufficient evidence is governed by Jackson v. Virginia, 443 U.S. 307 (1979).  The Supreme Court held that, when reviewing a petitioner's challenge to the sufficiency of the evidence, federal courts must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational

---

[2] While this was Bentley's final claim in both his petition and objections to the R & R, we analyze it first as it will be important to our analysis of Bentley's ineffective assistance of counsel claim.

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis original).

This standard does not allow a reviewing court to substitute its judgment for that of the jury. Id. at 318-319 ("[T]his inquiry does not require a court to 'ask' itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.").   In fact, we must defer to the jury's findings regarding the credibility of witnesses, the resolution of conflicts of evidence, and the drawing of reasonable inferences.  Id.  The question before us is whether the "record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  Id. We must review the evidence "with reference to 'the substantive elements of the criminal offense as defined by state law.'"  Eley v. Erickson, 712 F.3d 837, 848 (3d Cir. 2013) (quoting Jackson, 443 U.S. at 324).  But we must "also recognize that 'the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law.'"  Id. (quoting Coleman v. Johnson, 132 S.Ct. 2060, 2064 (2012)).  The Superior Court applied the Pennsylvania standard for the sufficiency of the evidence claims, and our Court of Appeals has held the Pennsylvania standard is consistent with the federal standard established in Jackson. See Evans v. Court of Common Pleas, Delaware County, 959 F.2d 1227, 1233 (3d Cir. 1992). Therefore, the state has not applied a standard "contrary to" clearly established federal law, so habeas relief is only appropriate if we found the Superior Court's decision was based on unreasonable application of Jackson or involved an unreasonable determination of the facts.

The Superior Court found the evidence supported Bentley's conviction for aggregated assault, which in Pennsylvania is defined as an "attempt[] to cause serious bodily injury to another, or cause[] such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life."  18 Pa.C.S. § 2702(a)(1).  We find

that the Superior Court's decision did not involve either an unreasonable application of <u>Jackson</u> or an unreasonable determination of the facts. The record evidence, viewed in the light most favorable to the prosecution, could cause a rational fact finder to conclude that Bentley was guilty beyond a reasonable doubt. Fitzsimmons testified that, while engaged in an altercation with Bentley and several other individuals, he heard Bentley say, "fuck that," then heard several shots and saw flashes coming from the direction of Bentley's wheelchair. Notes of Testimony ("N.T.") Dec. 7, 2007 at 83-84. Fitzsimmons suffered gunshot wounds to his hip, leg, and elbow. <u>Id.</u> at 73-74. A rational trier of fact could have accepted <u>only</u> Fitzsimmons's testimony, and found Bentley guilty of aggravated assault beyond a reasonable doubt, and thus we find that neither the Superior Court nor Judge Sitarski erred in their analyses.

The Superior Court also found that there was sufficient evidence for a jury to convict Bentley of first-degree murder, which is proved when all three of these elements are met: "(1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill." <u>Commonwealth v. Wright</u>, 961 A.2d 119, 130 (Pa. 2008) (internal citations and quotations omitted). We conclude that this finding is supported by the record evidence and therefore the Superior Court's decision did not constitute an unreasonable application of <u>Jackson</u> or an unreasonable determination of the facts.

As the Superior Court wrote, the evidence presented at Bentley's trial established that:

> "(1) [Bentley] had [an] acrimonious relationship with Purnell's girlfriend; (2) he had recently broken into the girlfriend's home when both she and Purnell were sleeping; (3) [Bentley]'s alibi had been discredited; (4) the same guns in the two prior shootings were both used in the Purnell shooting; and (5) both victims of the two prior shootings identified [Bentley] as their shooter."

<u>Commonwealth v. Bentley</u>, No. 831 EDA 2013, slip op. at 17. The circumstantial evidence against Bentley was also strong. Purnell started dating Bentley's ex-girlfriend, Floyd, after she

and Bentley went through a contentious breakup.  N.T. Dec. 11, 2007 at 20-21.  Two weeks

before Purnell's murder, Bentley tried to break into Floyd's home while she and Purnell were

sleeping.  Id. at 22-23.  Moreover, Patton testified that she did not know where Bentley was at

the time of the shooting and that she had lied to protect him since he was the father of her child --

thereby discrediting his alibi.  Id. at 111-12.

The physical evidence also supported the jury's guilty verdict.  Firearms Examiner

Kenneth Lay analyzed the ballistic evidence from the Patton, Fitzsimmons, and Purnell

shootings.  Id. at 174-187.  He testified that the .32 caliber cartridge casings collected at the

scene of the Fitzsimmons shooting were fired from the same gun as those collected from the

Purnell shooting, id. at 174-176, and the bullet specimens and jackets from the Purnell shooting

came from the same gun used in the Patton shooting.  Id. at 187.  In addition, both Patton and

Fitzsimmons identified Bentley as the gunman in their shootings.  N.T. Dec. 7, 2007 at 83-84

and N.T. Dec. 10, 2007, at 66-67.  This evidence, when viewed in the light most favorable to the

prosecution, was sufficient to find Bentley guilty of first degree murder beyond a reasonable

doubt, and thus neither the Superior Court nor Judge Sitarski erred in their analyses.  We will

therefore overrule Bentley's objections to the R & R's as to his insufficient evidence claims.

### C.      Ineffective Assistance of Counsel Claims

Bentley next objects to the R & R's disposition of his ineffective assistance of counsel

claims.  To be sure, the Sixth Amendment guarantees every criminal defendant the right to

assistance of able counsel.  U.S. CONST. amend. VI.  This assistance must not only be

perfunctory, but effective.  See Saranchak v. Sec'y Pa. Dep't of Corr., 802 F.3d 579, 588 (3d Cir.

2015) (stating that defendants are entitled to the effective assistance of counsel).  The right to

effective assistance of counsel protects the fundamental right to a fair trial afforded to every criminal defendant.  Id. (quoting Strickland v. Washington, 466 U.S. 668, 685 (1984)).

The Supreme Court has set out a two-prong test for determining whether a criminal defendant has suffered a violation of his constitutional rights by having ineffective assistance of counsel.  First, a habeas petitioner must show that his counsel's performance was deficient, meaning that the representation failed to meet an objective standard of reasonableness "as defined by 'prevailing professional norms.'"  Saranchak, 802 F.3d at 588 (quoting Outten v. Kearney, 464 F.3d 401, 414 (3d Cir. 2006)).  More specifically, "we must 'judge the reasonableness of counsel's challenged conduct on the facts of the particular case, reviewed as of the time of counsel's conduct.'"  Parrish v. Fulcomer, 150 F.3d 326, 328 (3d Cir. 1998) (quoting Strickland, 466 U.S. at 690).  But we must be highly deferential to counsel's performance and not "second-guess counsel's assistance after conviction."  Id. (quoting Strickland, 466 U.S. at 689).  Second, a petitioner must show prejudice, meaning that he must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  This standard does not require the petitioner to prove that the evidence presented against him would have been insufficient if not for counsel's errors, nor must the petitioner show "that counsel's deficient conduct more likely than not altered the outcome."  Id. at 693.  But it does require the petitioner to go further than simply demonstrating "that the errors had some conceivable effect on the outcome of the proceeding."  Id.; see also Saranchak, 802 F.3d at 588.  We will analyze each of Bentley's ineffective assistance of counsel claims separately.  If we find that counsel's performance was deficient in multiple instances, we will cumulatively analyze the prejudice those deficiencies

13

caused to determine whether, but for those errors, the result of Bentley's trial would have been different.  See Fahy v. Horn, 516 F.3d 1698, 205 (3d Cir. 2008).

The Superior Court used Pennsylvania's three-prong test for analyzing ineffective assistance of counsel claims.  This test requires the petitioner to show that:  (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for his action; and (3) the petitioner was prejudiced by the ineffectiveness.  See Commonwealth v. Roney, 79 A.3d 595, 604 (Pa. 2013) (citing Commonwealth v. Pierce, 527 A.2d 973 (Pa. 1987)).  Our Court of Appeals has held that this test is not contrary to Strickland.  See Wertz v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000).  Therefore, we find that the state court did not apply law contrary to clearly-established Supreme Court precedent, and Bentley is only entitled to relief if he shows that the state court's decision was an unreasonable application of Strickland or involved an unreasonable determination of the facts.

### 1.    Ineffective Assistance Of Counsel Claims As To Alibi Witness

Bentley's first ineffective assistance of counsel claim relates to trial counsel's alleged failure to object to prejudicial testimony the Commonwealth introduced rebutting Bentley's alibi.  Judge Sitarski found that the Superior Court reasonably concluded that trial counsel did not err since the evidence rebutting the alleged alibi was admissible to show consciousness of guilt.  Bentley objects to this finding but we will summarily overrule his objection.

Trial counsel had planned to introduce an alibi for Bentley based on Aisha Patton's testimony that Bentley was with her on the morning of the murder.  But, on the first day of trial the prosecution notified trial counsel that it had prison telephone tapes of Bentley talking to Patton that appeared to show Bentley trying to manipulate Patton's story.  See N.T. Dec. 6, 2007 at 5-8.  Trial counsel then indicated that he would likely withdraw his notice of alibi, and did not

object to the prosecution's decision to call Patton as a prosecution witness.  Id. at 7-8.  ("[The prosecution] will do what [it] has to do with respect to any of the witnesses, but that's our intention at the moment, which is to withdraw the notices of alibi.")

Trial counsel's actions were in no way deficient.  He planned to introduce an alibi for his client to bolster his defense, but decided to withdraw it once the prosecution informed him of the damning evidence in the prison phone calls.  This evidence, as the Superior Court and Judge Sitarski properly noted, was admissible to show Bentley's consciousness of guilt.  See Commonwealth v. Johnson, 838 A.2d 663, 680 (Pa. 2003).  Moreover, a state court's application of state evidentiary law is binding on a federal habeas court.  Estelle v. McGuire, 502 U.S. 62, 68 (1991).  Because the evidence was relevant and admissible under state law, trial counsel cannot be found to be ineffective for his failure to object to admissible evidence.  The Superior Court's determination that this claim lacked merit was a reasonable application of Strickland, and we will therefore overrule Bentley's objection as to this claim.

## 2. Ineffective Assistance Of Counsel Claim Relating To Prior Bad Acts

Bentley's next ineffective assistance of counsel claim relates to trial counsel's failure to object to prior bad act testimony or to ask for a limiting instruction from the trial court.  Judge Sitarski found that the Superior Court reasonably concluded that this claim lacked merit since the evidence presented at trial was admissible to show motive and that Bentley, who uses a wheelchair, was physically capable of committing murder.  Bentley objects to this finding, but we will overrule his objection.

April Floyd, Bentley's ex-girlfriend who was dating Purnell at the time of his murder, testified that Bentley had tried to break into her home -- where she and Purnell were sleeping -- several weeks before Purnell was killed.  N.T. Dec. 11, 2007 at 22-24.  The Superior Court found

that this testimony was admissible because it helped to establish that Bentley had a motive to kill

Purnell and that Bentley was physically capable of committing murder.  Commonwealth v.

Bentley, No. 831 EDA 2013, slip op. at 13.[3]  Because the evidence was relevant and admissible

under state law, trial counsel cannot have been ineffective for failing to object to the introduction

of admissible evidence.  The Superior Court's determination that this claim lacked merit was a

reasonable application of Strickland and we will overrule Bentley's objection as to this claim.

### 3.      Ineffective Assistance Of Counsel Claim Relating To Character Testimony

Bentley next asserts a claim for ineffective assistance of counsel relating to trial counsel's

failure to object to Taline Mason's testimony concerning Purnell's character and reputation.

Judge Sitarski found that the Superior Court reasonably concluded that the claim lacked merit

since the testimony did not in any way prejudice Bentley.  Bentley objects to this finding, but we

will overrule his objection.

Mason was a 'life in being' witness whose testimony was elicited to establish that Purnell

was alive and well prior to his murder.  She testified that (1) Purnell was the father of one of her

children, (2) she knew Purnell for fourteen years, (3) Purnell had no criminal record, and (4) he

had worked as a mechanic/engineer.  N.T. Dec. 10, 2007 at 55-56.  We do not find it

unreasonable that counsel failed to object to such innocuous testimony -- which lasted just a few

minutes.  And, even if it were unreasonable under Strickland for trial counsel not to have

objected during Mason's testimony, a five minute description of the victim's life would in no

way have prejudiced the jury.  We find that this claim satisfied neither prong of Strickland, and

---

[3] As we noted earlier, a state court's application of state evidentiary law is binding on a federal
habeas court.  Estelle, 502 U.S. at 68.

thus the Superior Court's adjudication was reasonable.  We will therefore overrule Bentley's objection.

### 4.      Ineffective Assistance Of Counsel Relating To Closing Arguments

Bentley finally brings a claim for ineffective assistance of counsel relating to trial counsel's failure to object to the prosecutor's inflammatory closing arguments.  Judge Sitarski found that the Superior Court reasonably concluded that the claim lacked merit since the prosecutor's comments did not prejudice the jury.  Bentley objects to this finding, but we will overrule his objection.

To properly analyze this claim, which Bentley has categorized as an ineffective assistance of counsel claim, we must first review the Supreme Court's prosecutorial misconduct jurisprudence.  A petitioner is entitled to habeas relief if "the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1973)).  Put another way, the prosecutorial misconduct must have been so significant that it denied the defendant a fair trial.  United States v. Bagley, 473 U.S. 667, 676 (1985).  Thus, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden, 477 at 181.  A court must examine the prosecutor's alleged misconduct in the context of the entire trial when deciding whether the conduct establishes a constitutional violation.  Greer v. Miller, 483 U.S. 756, 765-66 (1987).  This review  includes evaluating the prosecutor's remarks by considering their "scope…relation to the context of the trial, the ameliorative effect of any curative instructions and the strength of the evidence supporting the conviction."  United States v. Rivas, 493 F.3d 131, 140 (3d Cir. 2007).  If the evidence in a case is strong, and the trial court instructs the jury that arguments from counsel are not evidence, it is less likely that the

prosecutor's alleged misconduct would influence the jury's verdict.  Darden, 477 U.S. at 182.

Finally, our Court of Appeals has determined that the Pennsylvania and federal tests regarding

prosecutorial misconduct are "substantively identical," Reid v. Beard, 420 F. App'x 156, 160 (3d

Cir. 2011), and therefore habeas relief is only appropriate if we find that the Superior Court's

resolution of this claim involved an unreasonable application of Darden or an unreasonable

determination of the facts.

       Bentley specifically claims that the following excerpt from the prosecutor's closing

arguments comprised a constitutional violation:

> In one of the old Eastwood movies when he was talking about life
> and death, he said something to the effect, When you kill someone,
> it takes everything he has and everything he will have.
>
> For whatever your selfish reasons were, Mr. Bentley, did Mr.
> Purnell deserve to die just because he was seeing your ex-fiancée?
> And by the way, when you were putting together your story,
> maybe you were leaning a little too heavy on love and not truth
> because Aisha gave you up.
>
> So as I close, when you point a gun, not one gun but two,
> waistband, bracing yourself, ten shots from the ten that Aisha said
> is yours, two more shots from the .32 that Mr. Fitzsimmons said is
> yours, he had seen you with it before…
>
> It was you.  It was you.  You pulled the trigger.  You chose your
> target.  And you didn't face him like a man.  You snuck him.  And
> back in the old game days, we would say you slid him, sneaked up,
> kind of like the midnight rambler, emptied one gun, went to the
> second…
>
> You went to get him, but now we got you.  In the words of Aisha
> Patton, all DAs in a lie.  You don't know what they're going to do.
> They sent the first team this time, sir, guilty of murder in the first
> degree because that's what you did.  It was beyond assassination.
> It was beyond torment. [Objection, sustained by Court]
>
> Twelve shots, dead body, all over.  Lunchtime.  Let's eat.

N.T. Dec. 12, 2007 at 97-99.

The question here is not just whether the prosecutor's remarks were improper, as Bentley seems to suggest in his Objections.  One analysis must take another step and determine if those remarks were prejudicial enough that they "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  Darden, 477 U.S. at 181.  Even if we were to agree that the prosecutor's statements were inappropriate or over the top, we cannot grant habeas relief unless we find that the Superior Court was unreasonable in its determination that Bentley was not prejudiced by these statements, and we cannot so find.

First, the prosecutor's closing arguments, while overly theatrical, accurately reflected the evidence presented.  Second, as we noted earlier, the evidence in this case was strong.  The prosecution presented evidence that Bentley had the motive to kill Purnell, that he had attempted to break into Floyd's house while she and Purnell were sleeping, that his alibi was discredited, and that the guns used in the Purnell murder were the same ones used in the Patton and Fitzsimmons shootings where Bentley was identified as the gunman.  Third, the trial court judge instructed the jury that closing arguments are not evidence and could not be considered as such. N.T. Dec 12, 2007 at 117.

Bentley's claim here, though, is an ineffective assistance of counsel claim, and it fails for two reasons.   First, trial counsel did object to the prosecutor's closing arguments.  N.T. Dec. 10, 2007 at 99.  Therefore, this claim does not satisfy the first prong of Strickland.  Second, while no further analysis is necessary, we feel compelled to note that this claim also fails because Bentley has not demonstrated prejudice.  As noted, we find no merit in the underlying prosecutorial misconduct claim.  Bentley's final ineffective assistance of counsel claim thus fails both prongs of Strickland.  We therefore find that the Superior Court's resolution of this claim was reasonable and thus will deny Bentley's objection.

**V.**     **Conclusion**

We find that Bentley's objections to the R & R lack merit and we will therefore overrule them.  We also find that reasonable jurists could not disagree with our resolution of this matter.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).  We will therefore approve and adopt Judge Sitarski's R & R, dismiss Bentley's petition with prejudice and without an evidentiary hearing, and decline to issue a certificate of appealability.

BY THE COURT:

 /s/ Stewart Dalzell, J.
Stewart Dalzell, J.

20